**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

FRANK NALI,

          Petitioner,

v.                                                     Case Number: 07-CV-15487
                                                       Honorable Arthur J. Tarnow

THOMAS PHILLIPS,

          Respondent.

_____/

**OPINION AND ORDER
GRANTING PETITION FOR WRIT OF HABEAS CORPUS
AND DENYING PETITIONER'S MOTIONS, DOCKETED NUMBERS 40 THROUGH
45 AND 48 AS MOOT**

Petitioner Frank Nali, a Michigan state inmate currently incarcerated at the Mound

Correctional Facility in Detroit, Michigan,[1] filed a *pro se* petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254, challenging his conviction for extortion for an act on or about

September 2, 2002, MICH. COMP. LAWS §750.213.

Petitioner alleges (1) there was insufficient evidence presented to support his conviction

for extortion, (2) his trial counsel was ineffective for failing to meet with him, for failing to

interview witnesses, and for failing to review discovery material in preparation for trial, (3)

prosecutorial misconduct, (4) various trial court errors, (5) the statute under which he was

charged is unconstitutional, (6) judicial misconduct, and (7) that his due process rights were

violated when the Michigan Parole Board failed to follow statutory guidelines and procedures in

determining his parolability.

_____

[1]When Petitioner initially filed this petition, he was incarcerated at the Pugsley
Correctional Facility in Kingsley, Michigan.

The Court concludes that, due to the lack of sufficient evidence to support his conviction for extortion, Petitioner's petition for writ of habeas corpus is unconditionally **granted**.

## I.  BACKGROUND

### A.  Facts

Petitioner's troubles in this case arose as a result of a ten-year-extramarital relationship. At trial, the Complainant, his former lover, testified as follows:

She and Petitioner met in 1991, at Balley's Gym located in St. Claire Shores, Michigan. At the time, she was married and had two children.  Initially, her relationship with Petitioner began as a friendship and, within six to eight months, it evolved into an affair.  She testified that she devoted a substantial amount of her free time to developing her relationship with Petitioner. During the ten-year period, she and Petitioner met at his house, about one to two times a week. Their trysts eventually escalated to at least five to six times a week.

After about two or three years of the relationship, on one occasion, when she went over to Petitioner's house, she saw that he had a video camera set up.  She testified that she became upset and told Petitioner that she was not comfortable being videotaped, because if the video fell into the "wrong hands, it would be devastating to me and my family." (Trial Tr. vol. II, 25, Feb. 25, 2003.)  She nevertheless agreed to the use of the camera to display their sexual encounters on the television, but said that she did not agree to record the encounters.

About three years later, again while at Petitioner's home, she discovered a videotape with her name on it.  She confronted Petitioner about her finding and asked him if it were a videotape of them having sex.  Petitioner confirmed that it was.  She then told Petitioner that she wanted the tape destroyed.  However, Petitioner told her he wanted it as a souvenir and said that they

2

should watch the tape together.  She refused.  She then told Petitioner she was going to take the tape home and destroy it herself.  Petitioner attempted to take the tape from her.  He opened the cassette and pulled out the tape, trying to destroy it.  She picked up the cassette and attempted to pull out more of the tape.  She said she believed that the video cassette had been destroyed.

Subsequently, she found a second tape, while she and Petitioner were watching a video of Petitioner and his ex-girlfriend having sex.  Also on that tape was a recording of her and Petitioner having sex.  There is no evidence in the record suggesting that she attempted to destroy that tape or that she tried to persuade Petitioner to destroy it.

Complainant testified that there were several times during their relationship, especially when they argued, that she attempted to end it, but Petitioner would pressure her to stay by telling her that he was going to tell her family about their affair.

Then, in September 1999, while Petitioner was away, Complainant agreed to watch his home.  During that time, she did not destroy the tapes.  Rather, she wrote to Petitioner, exchanging about forty hand-written letters with him.

When Petitioner returned in 2000, they had an argument.  She told him she was going to leave him.  She testified that Petitioner said, "I know just what to do.  I just make one phone call and tell Jim."  (Trial Tr. vol. II, 29, Feb. 25, 2003.)   However, the relationship continued.

On cross-examination, Complainant admitted that incident occurred about two years before Petitioner was charged with the present offense.  The following colloquy took place between her and defense counsel:

> Q.  My initial question was in April or May of 2000 that was the only identifiable time when [Petitioner] threatened to show that tape to your family or your husband or your mother; is that correct?

3

A.  Right.

Q.  And that didn't occur in September of 2002, did it?  It was several years before?

A.  Two years before, right.

(Trial Tr. vol. II, 78-79, Feb. 25, 2003.)

Complainant filed for divorce from her husband in 2001, which was finalized in May 2002.  Her relationship with Petitioner continued for about four more months after the divorce.

Then, on September 3, 2002, she attended a Jazz Festival in Detroit with some friends. The next day, when she was at the gym, Petitioner questioned her about the festival.  She said she walked away because she was annoyed.  Later that evening, he showed up at her house. They had an argument.  She asked him to leave the house.  He refused.  Eventually Petitioner left, but returned about six times that night, ringing her doorbell each time.  She refused to answer.  Rather, she called the police.  They agreed to patrol the area that night.

Complainant testified that the following day she told her daughter about her ten year affair with Petitioner.  And, the day after that, she visited her son at college and also told him about the affair.  Subsequently, on or around September 5, 2002, she said that she told Petitioner that their relationship was over.  She said he was angry, yelling obscenities at her and telling her that she was crazy.

When Complainant went to work the following day, there were voicemails from Petitioner.  She testified that between September 6, 2002, and September 12, 2002, Petitioner left seventeen voicemails.  She never responded, but rather, she transferred them to a microcassette, which she gave to the police.

4

On September 13, 2002, Complainant received a phone call from her former husband, telling her that a package, containing a videotape of her and Petitioner having sex, had been sent to their daughter, along with a letter.  She also received phone calls from her brothers, telling her that similar packages were sent to them.

The tape-recorded-voice-mail messages, the letters, and the videotapes were admitted into evidence.

Complainant testified that the voice-mail messages had a theme of punishment and consequences for bad behavior–"for all my lying and treating him badly over the years.  I deserved to be punished."  (Trial Tr. vol. II, 40, Feb. 25, 2003).  In one, Petitioner compared their "relationship to that of a parent and a child where a parent is – if he truly loves a child must punish the child."  (Trial Tr. vol. II, 41, Feb. 25, 2003).

The contents of the letters that were sent to her brothers and to her daughter were similar in nature.  The following letter, sent to one of her brothers, was read into the record by Complainant:

> Q.     Okay.  Could you please read to us what that letter says?
>
> A.     Yes.  The enclosed video contains very sensitive material and should not be viewed in the presence of anyone under the age of 21.  It is time the truth be told.  Mary has lied to everyone.  The video shows exactly what she's been doing for many years.  Was it coincidental that [she] got divorced shortly after her son turned 21?
>
>      It was all planned.  She did not want any responsibilities toward her children anymore.  She immediately found her own apartment so she could go on making these films without being constrained by living with her children.

> The material in the video shows X - - excerpts from
> several films Mary has made.  These videos are found in some
> places that sell these material[s].  The entire family should know.
> And it is hoped that you would inform them so these tapes would
> not have to be sent to all members of the family including her
> parents.

(Trial Tr. vol. II, 58-59, Feb. 25, 2003).

 At the completion of the prosecution's case-in-chief, defense counsel moved for a

directed verdict on all charges.  The trial court granted the motion as to the three obscenity

charges, but denied the motion as to the extortion and stalking charges.

Against the advice of his attorney, Petitioner testified on his own behalf.  No other

witnesses were presented.

Petitioner testified that he met Complainant in 1990.  He said they began a sexual

relationship around 1992, which lasted until 2002.  During the last three to four years of their

relationship, they saw each other about five to six times a week.  He said he never made any

threats to expose his relationship with her.

Petitioner acknowledged that he taped their sexual encounters, but said Complainant

consented.  He said she never asked him to destroy the tapes and that they frequently watched

the tapes together.  It was his testimony that the telephone messages left on her voicemail were

simply his way of explaining his point of view regarding their break up.  He did not consider the

phone messages to be threatening.

6

**B.  Procedural History**

On February 26, 2003, Petitioner was found guilty on the extortion charge and not guilty on the stalking charge.  He was sentenced to 13 to 20 years imprisonment, which exceeded the guidelines range of 2 ½ years to 4 years 2 months.

On April 4, 2003, Petitioner filed a claim of appeal from that decision with the Michigan Court of Appeals.  Additionally, on April 8, 2003, Petitioner filed a motion for a new trial with the trial court, and on April 22, 2003, filed an addendum, alleging ineffective assistance of counsel.  The trial court never acted on those motions–no hearing was held and no order on those motions appear in the record.

Rather, on November 10, 2004, the succesor Judge granted Petitioner's motion for re-sentencing, ruling that substantial and compelling reasons did not support the upward departure imposed.  On December 6, 2004, Petitioner was re-sentenced to 4 years 2 months to 20 years imprisonment.

Subsequently, the State filed an appeal, challenging the amended judgment of sentence. The Michigan Court of Appeals consolidated the State's appeal with Petitioner's appeal. Petitioner also cross-appealed the States's appeal.

On December 29, 2005, the Court of Appeals affirmed Petitioner's conviction and sentence.  *People v. Nali*, No. 247843, 2005 WL 3556110 (Mich.Ct.App. Dec. 29, 2005). Subsequently, he filed an application for leave to appeal with the Michigan Supreme Court, which was denied.  *People v. Nali*, 475 Mich. 879, 715 N.W.2d 773 (2006).

The following claims were raised in both state appellate courts either in Petitioner's appeal of right or in his cross-appeal:

7

I.      There was insufficient evidence to support the conviction
        for extortion.


II.     The trial court erred by denying [Petitioner's] motion for
        directed verdict on the extortion charge.

III.    The trial court abused its discretion by denying [Petitioner]
        new counsel.

IV.     The trial court committed several errors and deprived
        [Petitioner] of his due process rights and a fair trial.

V.      MICH. COMP. LAWS §750.213 is unconstitutional for
        vagueness.

VI.     The trial court abused its discretion by denying
        [Petitioner's] motion for a new trial and motion for
        evidentiary hearing.

VII.    [Petitioner's] conviction was against the manifest weight of
        the evidence.

VIII.   [Petitioner] was denied effective assistance of counsel as
        guaranteed by the Sixth Amendment.

IX.     The prosecutor was guilty of misconduct and deprived
        [Petitioner] of his constitutional right of due process.

X.      The trial judge's actions amounted to misconduct and also
        deprived [Petitioner] of due process.

Following, Petitioner filed a motion for relief from judgment, pursuant to Mich.Ct.R.

6.500 *et. seq.*, asserting that Complainant violated state law by failing to give sworn testimony

before the Magistrate Judge who issued the arrest warrant and that there was no probable cause

to arrest him.  On February 20, 2007, the circuit court issued an order denying the motion.

*People v. Nali*, No. 02-13154 (Wayne County Circuit Court, Feb. 20, 2007).

8

Petitioner filed a delayed application for leave to appeal that decision with the Michigan Court of Appeals, alleging that the circuit court had no jurisdiction to charge him for extortion because his arrest was illegal. On June 26, 2007, the Michigan Court of Appeals denied his delayed application. *People v. Nali*, No. 276743 (Mich.Ct.App. June 26, 2007). Subsequently, on November 29, 2007, the Michigan Supreme Court also denied his application for leave because he "failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." *People v. Nali*, 480 Mich. 951, 741 N.W.2d 372 (2007).

Petitioner's habeas petition was filed on December 27, 2007, raising the same claims as raised in both state appellate courts. On January 14, 2008, the Court appointed counsel for Petitioner, and subsequently, substitute counsel was appointed on November 5, 2008. A supplemental brief was filed, addressing the following:

> I.   The district court should grant a writ of habeas corpus where the evidence was insufficient to establish the elements of extortion, where [Petitioner] only stated complainant deserved punishment for her adultery, and the decision to the contrary was an unreasonable application of *Jackson v. Virginia*[, 443 U.S. 307 (1979)].[2]
>
> II.  Trial counsel was constitutionally ineffective at the critical pre-trial stage of the proceedings and at trial by failing to meet with his client, failing to interview witnesses, review discovery and otherwise prepare for trial [thereby] depriving [Petitioner] of his Sixth Amendment right to counsel and Fourteenth Amendment right to due process and a fair trial.[3]

---

[2]Petitioner's claims I, II, V, VI, and VII are subsumed into this claim.

[3]Petitioner's claims III, IV, VIII, and are subsumed into this claim. Regarding Petitioner's claims VI, IX and X, because the Court has concluded that Petitioner is entitled to habeas relief on his insufficient evidence claim, the Court considers it unnecessary to review those claims and declines to do so. *See Haynes v. Burke*, 115 F. Supp.2d 813, 819-820

### 1. The Evidentiary Hearing

On March 30, 2009, an evidentiary hearing was held regarding Petitioner's ineffective assistance of counsel claim.  The hearing was continued on May 12, 2009.  Petitioner's trial counsel testified to the following: He acknowledged that he did not interview any witnesses prior to trial.  When asked why he did not interview any witnesses, he replied: "I didn't feel that they would be favorable to my client at all.  They attended the preliminary examination.  They appeared to be very supportive of the complaining witness, and it's fair to say that Mr. Nali was not their favorite person." (Evidentiary Hr'g Tr. 22, Mar. 30, 2009.)  When asked if he received a letter from Petitioner regarding a request to obtain the records, namely the interrogatories, from Complainant's divorce file, he acknowledged the request, and said that he looked "at the divorce file and found no interrogatories."  *Id.* at 24.  Counsel also acknowledged that the defense in the case was not to present a defense.

Trial counsel did not cross-examine Complainant's former husband, because he thought the jury would have been sympathetic toward him.  Regarding his strategy in cross-examining Complainant, he said that he believed that he had successfully "painted her a liar," because she had been lying to her family for a decade about her affair with Petitioner.  (Evidentiary Hr'g Tr. 10, May 12, 2009.)  He felt that with Complainant's admissions that she lied to her family about the affair, she had impeached her own credibility.  He also acknowledged that he did not cross-examine the sisters-in-law because he felt like he had the case won.  He also acknowledged that he did not call any other witnesses that Petitioner had asked him to call because he felt that they would not add anything to the defense and that their testimonies would be collateral.

---

(E.D.Mich. 2000); *Berrier v. Egeler*, 428 F. Supp. 750, 754 (E.D.Mich. 1976).

Regarding Petitioner's request to testify, it was trial counsel's trial strategy to advise Petitioner against testifying on his own behalf, but he did not agree.  Trial counsel testified that he made a record at trial, stating his opposition.  Petitioner testified.  When trial counsel talked to the jury after the verdict, the jury told him, and the prosecutor, that they were prepared to acquit Petitioner if he hadn't taken the stand.

When questioned whether Petitioner asked him to challenge the testimony of the prosecution's fingerprint expert, trial counsel testified, "I didn't believe that the Michigan State police trooper–witness's testimony was challengeable.  He was qualified as [an expert].  And I thought it was a blind alley."  (Evidentiary Hr'g Tr. 31, Mar. 30, 2009; Evidentiary Hr'g Tr. 12, May 12, 2009 .)

## II.  STANDARD OF REVIEW

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state-court factual determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

Petitioner must therefore demonstrate that the Michigan Court of Appeals' decision was contrary to, or involved an unreasonable application of, existing federal law,

or that it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254 (d).

### III.  DISCUSSION

### A.  Insufficient Evidence

Petitioner claims that there was insufficient evidence to establish that he committed extortion and, therefore, his motion for a directed verdict should have been granted. The last court to issue a reasoned decision in this case, the Michigan Court of Appeals stated:

> In the present case, the evidence indicated that when the victim had attempted to break up with defendant in the past, he threatened to expose their affair, including revealing letters and videotapes to her family, if she did not continue with the relationship. On September 5, 2002, the victim finally broke off her ten-year relationship with defendant. Between September 6 and

12

> 12, 2002, defendant left 17 telephone messages with the victim indicating that there would be consequences to her conduct, that she deserved to be punished, and that he would be the person to do it.  On September 12, 2002, the victim went to the police.  An officer called defendant, who denied having called the victim.  The following day, a videotape depicting defendant and the victim together appeared at her ex-husband's home, addressed to the victim's daughter.  Two additional videotapes followed, addressed to two of the victim's brothers.
>
> Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable a reasonable jury to find beyond a reasonable doubt that defendant maliciously threatened to injure the victim with the intent to compel her not to break up with him. Therefore, defendant was properly convicted of extortion, and the trial court did not err in denying defendant's motion for a directed verdict.

*Nali*, No. 260267, 2005 WL 3556110, slip op. at 2.

The Due Process Clause of the Fourteenth Amendment protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358 (1970).  The issue before this Court is whether sufficient evidence was presented to the jury from which a reasonable factfinder could find that the essential elements of the crime were proven beyond a reasonable doubt.  The appropriate standard of review in a federal habeas corpus proceeding involving a claim of insufficiency of evidence in a state-criminal conviction is whether, after reviewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006).  This standard of review recognizes the trier of fact's responsibility to reasonably resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *Jackson*, 443 U.S. at 318; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).

13

The habeas court must review all of the evidence in the record and determine whether a reasonable jury could have found guilt beyond a reasonable doubt. "The evidence must afford a substantial basis from which a fact in issue can reasonably be inferred." *Spalla v. Foltz*, 615 F.Supp. 224, 227 (E.D.Mich. 1985) (citing *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir. 1985)). Here, Petitioner challenges the sufficiency of the evidence to support his extortion conviction. In making this judgment, this Court must bear in mind that the beyond a reasonable doubt standard, itself mandated by the Due Process Clause, requires the factfinder "to reach a subjective state of near certitude of the guilt of the accused [and] symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself." *Id.* at 315 (citing *Winship*, 397 U.S. at 372) (Harlan, J., concurring).

> "In a criminal case [ ] we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty . . . . In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free. It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation." *Winship*, 397 U.S. at 371 (Harlan, J., concurring).

This Court recognizes that the existence of the *Jackson* test presupposes that juries accurately charged on the elements of a crime and on the strict burden of persuasion to which they must hold the prosecution, nevertheless may occasionally convict, even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt. In conducting the inquiry, the Court considers all the evidence presented in the record.

14

Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable. *Johnson v.Hofbauer*, 159 F.Supp.2d 582, 596 (E.D. Mich. 2001). Moreover, the *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324.

Under Michigan law, the offense of extortion, MICH. COMP. LAWS § 750.213, provides in pertinent part:

> Sec. 213. MALICIOUS THREATS TO EXTORT MONEY– Any person who shall, either orally or by written or printed communication, maliciously threaten to accuse another of any crime or offense, or shall orally or by any written or printed communication maliciously threaten any injury to the person or property or mother, father, husband, wife or child of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 20 years or by a fine of not more than 10,000 dollars.

The elements of extortion therefore are (1) a communication, (2) threatening future injury to the person or property or family of another, and (3) with the intent either to obtain money or some monetary advantage or to compel the person to do or not to do some act, against his or her will. MICH. COMP. LAWS § 750.213*; People v. Fobb*, 145 Mich.App. 786, 790, 378 N.W.2d 600 (1985).

Therefore, the first element the prosecution had to prove was that there was an extortionate communication. The Information stated that the alleged threat occurred on September 12, 2002. At trial, Complainant testified that on only one occasion did Petitioner threaten to reveal the videotape to her family, and that was a full 2 ½ years prior to the alleged

15

conduct charged.  According to her, the "threat" was not conditional or extortionate in nature.

By September 12, 2002, the date of the alleged offense, she was divorced from her husband for

several months.  If Petitioner's communication were for her to stay with him and not break off

the relationship, or he would reveal the tape, there was no such threat contained in any of the

September 2002 voice-mail messages.  And, by that date, Complainant's children and husband

were already advised of the affair.

A review of the documents regarding the voice-mail messages submitted by both parties

demonstrates only the anger and the frustration of a scorned lover.  Although Petitioner refers to

consequences for Complainant's deceitful behavior and that she deserved "punishment," the

Court fails to find that there was a money request or any other act demanded of her that would

satisfy the elements of extortion.  "Instead, the Legislature intended punishment for those threats

that result in pecuniary advantage to the individual making the threat or that result in the victim

undertaking an action of serious consequence, such as refusing to report a defendant's sexual

misconduct or refusing to testify."  *People v. Hubbard*, 217 Mich.App. 459, 485-86, 552 N.W.2d

493, 506 (1996).  Accordingly, a conviction for extortion will not be sustained where the act

required of the victim was minor with no serious consequences to the victim.  *Fobb*, 145

Mich.App. 786 at 791, 378 N.W.2d 600 at 602.  Here, it is only by conjecture and speculation

into the meaning behind Petitioner's remarks that one might construe them as veiled threats.

As for the second element of extortion, the threatening of future injury to the person,

property or family of another, the Court finds that the Michigan Court of Appeals unreasonably

applied the law regarding this element.  Prosecutions for statutory extortion have generally been

characterized by threats of future harm, if the victim does not comply with the extortionist's

16

wishes. *People v Percin*, 330 Mich. 94, 99, 47 N.W.2d 29, 32 (1951); *People v. Atcher*, 65

Mich.App. 734, 238 N.W.2d 389 (1975) (refusing to testify).  In all cases where courts have

upheld such convictions, the defendant made a future or "conditional" threat that required

someone to perform (or to refrain from performing) a particular act.  In *People v. Kruper*, 340

Mich. 114, 116, 64 N.W.2d 629, 630 (1954), the defendant said, "[w]e need two hundred dollars,

and we are going to get (sic) from you

and if we don't get it you have a nice wife and kid and we can take care of you too and we have

three irons in the car and we mean business."

Even if one accepts Petitioner's phone messages as threatening, they still do not rise to

the level of extortion.

The comments made in the voice-mail messages were not conditional in nature. Nothing

in those messages suggested that Complainant would suffer consequences if she failed to adhere

to some demand.  There was no "I'm going to do something horrible to you unless . . . "

component to any of Petitioner's alleged threats.  Petitioner did not ask her to do, or to not do,

anything except perhaps to seek psychological treatment.  Even if Petitioner's May 2000

comment could be interpreted as a conditional threat, if you break up with me, I will reveal this

explicit videotape to your husband and children, that alleged threat was made years before the

charged incident and the consequences were of

little moment by September 2002, because Complainant was divorced and her husband and

children were aware of her affair with Petitioner.

In this case, the Court finds that the Michigan Court of Appeals misapplied the

Constitution when it found "that there would be consequences to her conduct, that she deserved

17

to be punished, and that he would be the person to do it," and that "defendant maliciously threatened to injure the victim with the intent to compel her not to break up with him." *Nali*, No. 260267, 2005 WL 3556110, slip op. at 2. The facts as presented do not support that conclusion.

The Court also finds that there was insufficient evidence as to the third element of the offense: the intent to compel Complainant to do or not to do some act against her will. Under Michigan law, a person acts against his or her will when he or she only does the act in order to avoid injury to himself or herself or to avoid personal disgrace. The phrase "against his [or her] will," as used in the context of the extortion statute, is defined in C.J.I. 21:1:04 as follows:

> A person does an act or refrains from doing an act against his [or her] will when, with apparent willingness, he [or she] does the act with the understanding that thereby he [or she] will be saved from some personal injury to himself [or herself] or a member of his [or her] immediate family or saved from personal disgrace, doing such act as the lesser of two unpleasant alternatives, notwithstanding the fact that he [or she] may mentally protest against the circumstances which compel the choice.

*People v. Krist*, 97 Mich.App. 669, 673, 296 N.W.2d 139, 142 (1980) (citing C.J.I. 21:1:04).

Here, Complainant felt frightened by Petitioner's alleged threats in 2000. She felt trapped and devastated, seeing no way out. It was her position that she continued seeing Petitioner out of fear. However, this was not the conduct charged.

Rather, the Court finds that the record reveals otherwise. Complainant continued a relationship with Petitioner for ten years, even when Petitioner left the area for a full consecutive seven months. If she wanted to sever the relationship, then that was the best time.

18

The Court finds that Petitioner's conduct in this case, though spiteful and vengeful, does not represent the type of behavior made criminal as extortion.  There is no evidence of extortionate threats.

The Court finds that the Michigan Court of Appeals' decision is based on an unreasonable determination of the law in light of the evidence presented in the state-court proceedings.  28 U.S.C. § 2254(d).  Therefore, Petitioner is entitled to habeas corpus relief regarding this claim.

### B.  Ineffective Assistance of Counsel

Petitioner also alleges his trial counsel was ineffective for failing to meet with him, for failing to interview witnesses, and for failing to review discovery material in preparation for trial.  He also contends that he was denied his Sixth Amendment right to counsel when the trial court denied his pretrial request for new counsel and also prevented him from representing himself.

To show that he was denied the effective assistance of counsel, Petitioner must satisfy a two prong test.  First, he must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, Petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.  *Id.*; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  In other words, Petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy.  *Strickland*, 466 U.S. at 689.

19

Second, Petitioner must show that such performance prejudiced his defense. *Strickland*, 466 U.S. at 689. To demonstrate prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Here, Petitioner initially claims that counsel was ineffective for failing to adequately cross-examine Complainant, and the other witnesses, concerning inconsistencies in their testimony. The failure by trial counsel to cross-examine a prosecution witness can constitute ineffective assistance of counsel. *Hence v. Smith*, 37 F.Supp. 970, 983 (E.D. Mich. 1999). However, "courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Millender v. Adams*, 187 F.Supp.2d 852, 870 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997); *Dell v. Straub*, 194 F.Supp.2d 629, 651 (E.D. Mich. 2002); *Johnson*, 159 F.Supp.2d at 607 (internal citations omitted). Where trial counsel conducts a thorough and meaningful cross-examination of a witness, his or her failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective counsel claim. *Cardwell v. Netherland*, 971 F.Supp. 997, 1019 (E.D. Va. 1997).

In the present case, the Court finds that trial counsel's performance did not constitute ineffective assistance of counsel. The record shows, and the evidentiary hearing established, that, as a matter of trial strategy, he cross-examined the prosecution witnesses that he felt were necessary to cross-examine. Furthermore, in his closing argument, he emphasized the

20

inconsistencies in the testimony of the various witnesses presented.  *See Campbell v. United States*, 364 F.3d 727, 735 (6th Cir. 2004).  Trial counsel's failure to impeach Complainant about some of the inconsistencies in her testimony did not undermine confidence in the outcome of the case, since a variety of other impeachment evidence was admitted in this case.  *See Wolfe v. Bock*, 412 F.Supp.2d 657, 676-77 (E.D. Mich. 2006).

Therefore, the Court finds that trial counsel's trial strategy in this case was sound. He thoroughly cross-examined Complainant about the fact that she lied to her family about her ten-year affair with Petitioner, and thus, by doing so, he believed that she had impeached her own credibility.  Trial counsel further testified at the evidentiary hearing that he did not cross-examine her former husband or sisters-in-law because he believed that her testimony was damaging and that the testimony of those witnesses would be cumulative.  Finally, he testified that he did not challenge the prosecution's expert because he thought it was a "blind alley."  Trial counsel made all of those arguments in his closing argument to the jury.

The Court therefore concludes that trial counsel was not ineffective.  His decision to cross-examine, or not cross-examine, Complainant's former husband and sisters-in-law, was sound trial strategy.

Petitioner also alleges that counsel was ineffective for failing to interview key witnesses, and for failing to familiarize himself with a basic understanding of the evidence in this case.  To provide the effective assistance of counsel, an attorney must make a reasonable investigation into the facts and circumstances of the crime, or make a reasonable decision that a particular investigation is not necessary.  *Hence*, 37 F.Supp.2d at 984.  A particular decision not to

investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's professional judgment, when addressing an ineffective assistance of counsel claim. *Id.* (citing *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993). A distinction can be made between cases where there was a total failure by counsel to investigate and those cases where the defendant is merely dissatisfied with the degree of his attorney's investigation into possible defenses. *Lewis*, 11 F.3d at 1353; *Hence*, 37 F.Supp.2d at 984.

In the present case, Petitioner claims that trial counsel failed to adequately familiarize himself with the evidence to elicit exculpatory evidence in Petitioner's favor. The Court disagrees. The evidentiary hearing established that trial counsel was familiar with the case, and that it was his trial strategy not to introduce certain evidence because he believed that it would have been damaging to his client's case. In addition, he believed that, considering the circumstances of the case, he had the case won. The Court finds that trial counsel's alleged ineffectiveness in failing to investigate the evidence or the witnesses in this case did not deprive Petitioner of his constitutional right to the effective assistance of counsel absent a showing of prejudice. *Chadwick v. State*, 951 F.2d 863, 867 (8th Cir. 1991). Petitioner is therefore unable to show that he was prejudiced by trial counsel's failure to better familiarize himself with the evidence in this case, and that had he done so, there would have been a different outcome in his case.

Regarding Petitioner's allegations that he was denied his Sixth Amendment right to counsel when the trial court denied his pretrial request for new counsel and also prevented him from representing himself, the last court to issue a reasoned decision, the Michigan Court of Appeals, stated in pertinent part:

22

Defendant also argues in his pro se brief that the trial court abused its discretion by denying his motion for newly appointed counsel and for a continuance of trial. We disagree. A trial court's decision whether to appoint substitute counsel is reviewed for an abuse of discretion. *People v. Traylor*, 245 Mich.App 460, 462; 628 NW2d 120 (2001). A trial court's denial of a motion for a continuance is also reviewed for an abuse of discretion. *People v. Lawton*, 196 Mich.App 341, 348; 492 NW2d 810 (1992). In deciding whether to grant a continuance, a trial court should consider whether the defendant (1) asserted a constitutional right, (2) had a legitimate reason for asserting the right, (3) was negligent, and (4) requested previous adjournments. *Lawton*, *supra* at 348. Defendant must also show that he was prejudiced by the trial court's denial of his motion for a continuance. *Id.*

Appointment of substitute counsel is warranted only upon a showing of good cause, and if substitution will not unreasonably disrupt the judicial process. *Traylor*, *supra*. Counsel may be removed for, among other things, gross incompetence or a legitimate difference of opinion with regard to a fundamental trial tactic. *Id.*; *see also People v. Johnson*, 215 Mich.App 658, 663; 547 NW2d 65 (1996).

Defendant failed to demonstrate good cause for appointment of substitute counsel. The record does not support defendant's claim that counsel failed to investigate the facts and was unprepared to proceed to trial. To the contrary, counsel successfully moved to quash a search warrant for defendant"s home before trial, resulting in the exclusion of all evidence seized from the home. At trial, counsel successfully moved for a verdict of acquittal on three counts of disseminating obscenity and obtained an acquittal on an additional charge of stalking. The trial court did not abuse its discretion in denying defendant's motions for new counsel and for a continuance.

*Nali*, No 247842, 2005 WL 3556110, slip op. at 2-3.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend, VI.

This constitutional right is applicable to the states through the Fourteenth Amendment. *Serra v.*

23

*Michigan Dep't of Corrs.*, 4 F.3d 1348, 1351 (6th Cir.1993) (citing *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963)).  "A criminal defendant who desires and is financially able to retain his own counsel 'should be afforded a fair opportunity to secure counsel of his own choice.'"  *Id.* (quoting *Powell v. Alabama*, 286 U.S. 45, 53 (1932)).  However, "[n]ot every restriction of counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel.  *See Chambers v. Maroney*, 399 U.S. 42, 53-54 (1970).

The Court finds that, as reflected in the record, the trial court made an adequate inquiry into the crux of Petitioner's request for substitution of counsel and for the opportunity to represent himself.  Trial counsel was allowed an adequate opportunity to address the issues as well.  Accordingly, the Court finds that the state court did not unreasonably apply federal law in reaching its conclusion to proceed to trial with Petitioner's appointed counsel, as it was Petitioner decision to go forward.

The Court finds that Petitioner failed to establish that he was deprived of the effective assistance of counsel.  Because Petitioner failed to establish both that his trial counsel was deficient or that he was prejudiced by trial counsel's alleged omissions, the state appellate court's determination that Petitioner was not denied effective assistance of counsel was a reasonable application of the standard in *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## IV.  CONCLUSION

For the reasons stated, this Court concludes that Petitioner is entitled to federal habeas corpus relief on his insufficient evidence claim.  The Court therefore orders that Petitioner's conviction for extortion must be vacated.

## V.  ORDER

Accordingly, **IT IS HEREBY ORDERED** that Petitioner's "Petition for Writ of Habeas Corpus" [dkt. # 1] is **UNCONDITIONALLY GRANTED**.  Petitioner's conviction for extortion is ordered to be vacated and set aside.  Respondent is ordered to release Petitioner from custody. Because the Court has concluded that Petitioner is entitled to habeas relief on his insufficient evidence claim, the Court considers it unnecessary to review Petitioner's remaining claims and declines to do so.  *See Haynes v. Burke*, 115 F. Supp.2d 813, 819-820 (E.D.Mich. 2000); *Berrier v. Egeler*, 428 F. Supp. 750, 754 (E.D.Mich. 1976).

**IT IS FURTHER ORDERED** that Petitioner's motions, docket numbers, 40 through 45, and 48, are **DENIED** as moot.

S/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  June 29, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 29, 2009, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary

25